Maureen BACKE, individually and on behalf of all others similarly situated, Plaintiffs,

v.

NOVATEL WIRELESS, INC.; Peter V. Leparulo; George B. Weinert; Robert M. Hadley; Slim S. Souissi; and Catherine F. Ratcliffe, Defendants.

Case No. 08–CV–01689–H (RBB).

United States District Court, S.D. California.

April 1, 2009.

Douglas R. Britton, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA, Lionel Z. Glancy, Glancy Binkow and Goldberg, Los Angeles, CA, Michael I. Fistel, Jr., Holzer Holzer & Fistel, LLC, Atlanta, GA, for Plaintiffs.

Eric Landau, Travis S. Biffar, Jones Day, Irvine, CA, for Defendants.

## ORDER DENYING MOTION TO DISMISS

MARILYN L. HUFF, District Judge.

On January 9, 2009, lead Plaintiff Pension Fund Group filed a consolidated securities class action complaint ("CC") against Defendants Novatel Wireless, Inc. ("Novatel"), Peter V. Leparulo, George B. Weinert, Robert M. Hadley, Slim S. Souissi,

and Catherine F. Ratcliffe. (Doc. No. 23.) On February 9, 2009, Defendants filed a motion to dismiss the amended complaint. (Doc. Nos. 26–29.) Plaintiff filed a response in opposition on March 11, 2009. (Doc. Nos. 31–34.) Defendants filed a reply on March 23, 2009. (Doc. Nos. 37–39.) The Court held a hearing on the matter on March 30, 2009. Doug Britton, Eric Niehaus, and Lucas Olts appeared on behalf of Plaintiff. Eric Landau, Travis Biffar, and Shawn Harpen appeared on behalf of Defendants.

For the reasons set forth below, the Court denies Defendants' motion to dismiss.

### Background

For purposes of this motion to dismiss, the Court accepts as true all well-pleaded facts alleged in the Consolidated Class Action Complaint ("Complaint" or "CC"). *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002). Additionally, the Court as explained below has taken judicial notice of certain documents.

### A. Parties

Plaintiff Pension Fund Group is the lead plaintiff in a securities class action against Defendants Novatel, Peter V. Leparulo, George B. Weinert, Robert M. Hadley, Slim S. Souissi, and Catherine F. Ratcliffe. (CC ¶¶ 43–48.) Plaintiff alleges that during the Class Period, Novatel employed 300 people company-wide, with only 44 employees, including all five named individual Defendants, in "operations." (*Id.* ¶ 34.) Plaintiff alleges that Defendants essentially controlled Novatel, including its accounting practices, earning announcements, and SEC filings. (*Id.* ¶ 34.)

### 1. Plaintiff Pension Fund Group

Lead Plaintiff Pension Fund Group is comprised of Plumbers & Pipefitters' Local # 562 Pension Fund and Western Pennsylvania Electrical Employees Pension Fund, both of which purchased securities during the Class Period and was allegedly damaged thereby. (CC ¶ 42.)

### 2. Defendant Novatel

Novatel is a provider of wireless broadband access solutions for the worldwide mobile communications market. (CC ¶ 43.) Novatel is headquartered in San Diego, California and trades stock under the symbol NVTL on the Nasdaq. (*Id.*)

### 3. Defendant Peter V. Leparulo

Leparulo was, at relevant times, Chairman and Chief Executive Officer ("CEO") of Novatel. (CC ¶ 44.) During the Class Period, Leparulo prepared and signed Novatel's Form 10–K, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances, not misleading. (*Id.*) Leparulo issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiff alleges that while in possession of non-public material information, Leparulo sold 473,357 shares of his Novatel stock for insider trading proceeds of $11,530,258 during the Class Period. (*Id.*)

### 4. Defendant George Brad Weinert

Weinert was, at relevant times, President of Novatel. (CC ¶ 45.) During the Class Period, Weinert prepared and signed the Company's Form 10–K and 10–Q, and Sarbanes–Oxley Act of 2002 ("SOX") certifications filed with the SEC, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances, not misleading. (*Id.*) Weinert also issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiff alleges that while in possession of non-public material information, Weinert sold 121,985 shares of his Novatel stock for insider trading proceeds of $3,305,560 during the Class Period. (*Id.*)

### 5. Defendant Robert M. Hadley

Hadley was, at all relevant times, Senior Vice President of Worldwide Sales and Marketing of Novatel. (CC ¶ 46.) Plaintiff alleges that while in possession of non-public material information, Hadley sold 247,198 shares of his Novatel stock for insider trading proceeds of $4,681,696 during the Class Period. (*Id.*)

### 6. Defendant Slim S. Souissi

Souissi was, at all relevant times, Senior Vice President and Chief Technology Officer of Novatel. (CC ¶ 47.) Plaintiff alleges that while in possession of non-public material information, Souissi sold 272,560 shares of his Novatel stock for insider trading proceeds of $5,488,870 during the Class Period. (*Id.*)

### 7. Defendant Catherine F. Ratcliffe

Ratcliffe was, at all relevant times, Senior Vice President of Business Affairs and General Counsel of Novatel. (CC ¶ 48.) Plaintiff alleges that while in possession of non-public material information, Ratcliffe sold 143,366 shares of her Novatel stock for insider trading proceeds of $3,646,804 during the Class Period. (*Id.*)

### B. Defendants' Alleged Fraudulent Scheme and False Statements

Plaintiff alleges that between February 27, 2007 and November 10, 2008 (the "Class Period"), Defendants engaged in a fraudulent scheme to inflate Novatel's stock value so that Defendants could unload their stock in the company for a profit, as Novatel's executives had lost a fortune on their Novatel holdings in the preceding six years due to business prospects drying up in the telecom industry. (*Id.* ¶¶ 1, 12.) Plaintiff alleges that Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon, which in 2006 accounted for 38.2% and 19.7% of Novatel's revenue respectively. (*Id.* ¶ 14.) According to Plaintiff, "defendants knew that the market was particularly sensitive to information about these customers" and "[s]trong financial results would surely spur an increase in Novatel's stock price whereas any negative information regarding these customers would reduce it." (*Id.* ¶ 14.) Plaintiff alleges that throughout the class period, Defendants made false and misleading statements concerning Novatel's market share and financial results, failed to disclose material information about its contracts with Sprint, and failed to disclose that Novatel was prematurely shipping products in order to meet or exceed Wall Street expectations causing Novatel to improperly recognize revenue. Plaintiff alleges that during the Class period, Defendants were unloading their stock based on this inside information and benefitting from the artificially inflated stock price.

### 1. Sprint Cancellation

In early 2007, Novatel reported strong financial results, exceeded increasingly aggressive guidance, told investors that its USB modem was extremely successful in

the market, and that Novatel was seeing strong sales to Verizon and Sprint. (*Id.* ¶ 15.) On February 27, 2007, Defendant Weinert, in a press release, stated with respect to the first quarter of 2007, that "[Novatel] continue to ramp to meet increasing demand in the marketplace." (*Id.* ¶ 51.) Weinert also stated that day during the Company's earnings conference call, that competitors are using "fairly well tried out, older technologies and really the market isn't ready for that right now." (*Id.* ¶ 52.) In a press release on May 1, 2007, Novatel reported first quarter revenue increases of 174% year over year and Weinert stated that "[o]ur first quarter performance was the best in Company history . . . Sales were even higher than forecasted in our revised guidance due to strong end-of-the-quarter momentum for newly introduced ExpressCards and Ovation USB devices." (*Id.* ¶¶ 53–54.) On May 1, 2007 during the Company's earnings conference call, Defendant Leparulo stated that "the market for 3G Wireless is taking off and we believe we're perfectly positioned to take advantage of that growth." (*Id.* ¶ 55.) Defendant Weinert stated that, "[w]e certainly see strong demand for [our first generation] products, and we're leading the way, we're actually in a leadership position, in both the express card and the USB markets." (*Id.* ¶ 55.) On May 10, 2007, Novatel filed its Quarterly Report on Form 10–Q containing Sarbanes–Oxley Act of 2002 ("SOX") certifications with the SEC, which was signed by Defendant Weinert and which reaffirmed Novatel's financial results previously announced on May 1, 2007. (*Id.* 56.)

Plaintiff alleges that these statements about the Company's financial results and market share were false and misleading because they did not fairly present the financial condition of the Company throughout the first quarter of 2007. (*Id.* ¶ 57.) Plaintiff alleges that Novatel failed to disclose it was prematurely shipping product to meet or exceed its quarterly and yearend forecasts, failed to disclose that Sprint would discontinue all further orders of the Company's popular 720 USB card by the end of July 2007, concealed that the Company's product mix failed to meet the immediate needs of its two largest domestic customers, Sprint and Verizon, which was causing Novatel to lose market share, and signed false SOX certifications attesting to the accuracy of the financial results and effectiveness of Novatel's internal controls, as the Company admitted on November 10, 2008 that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (*Id.* ¶ 57.)

Plaintiff alleges that at the same time, Defendants were unloading massive amounts of their Novatel holdings, as during the Class Period, Defendants sold 1,258,466 shares of Novatel stock for almost $29 million in proceeds. (*Id.* ¶ 15.) Plaintiff alleges that 62% of the Defendants' Class Period sales occurred in June and July 2007, just before the market learned that Sprint would no longer be purchasing Novatel's 720 USB modem, information the company allegedly knew "for some time." (*Id.* ¶ 16.) Defendants sold this stock at the same time that Novatel was certified by Vodafone to sell its products in late June 2007, and when Novatel was on the verge of being certified at Telefonica and T–Mobile. (*Id.* ¶ 18.) Novatel's stock price collapsed from $29 in late July to almost $20 by the beginning of August on investors learning this information about Novatel losing position at Sprint. (*Id.* ¶ 17.) According to an analyst on July 20, 2007, "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint . . . We agree with the notion making the rounds indicating

that the popular EU 720 USB card from NVTL will in fact be end-of-lifed at Sprint as early as next week." (*Id.* ¶ 17.) Plaintiff alleges that Defendants were obligated to disclose the information about Sprint canceling its use of the 720 USB modem or abstain from trading, but failed to do either and thereby avoided a multimillion dollar loss. (*Id.* ¶ 17.)

## 2. Loss of Market Share

Plaintiff alleges that Novatel not only lost market share with Sprint's cancellation of the 720 USB modem, but throughout 2007 and continued to mislead investors. (CC ¶ 20.) On June 8, 2007, Defendant Weinert in a press release stated, "[w]e are currently seeing strong demand across our major product lines, most notably for our ExpressCards and Ovation USB devices." (*Id.* ¶ 58.) Novatel reported 113% revenue growth in 2Q07 and 90% revenue growth in 3Q07, which Defendants emphasized exceeded previous guidance. (*Id.* ¶¶ 59, 63.) In a press release dated August 6, 2007, Weinert stated against that, "[d]emand is strong across a wide range of products" and that "[a]doption of USB wireless modems has been a primary growth driver with over $85 million in sales in the nine months since its introduction." (*Id.* ¶ 59.) On November 5, 2007 on the Company's earnings conference call, Defendant Leparulo stated, "[we] saw strong demand for these products, and beat guidance and expectations once again. Our market continues to grow rapidly as 3G wireless data proliferates into mainstream technology." (*Id.* ¶ 64.) On the same call, Weinert stated that demand for Novatel's Next Generation USB products was so strong that, "our major hurdle is tightness in our supply channel for selected components due to the strong demand." (*Id.* ¶ 64.) Weinert stated on August 6, 2007 on the Company's earnings conference call that, "[w]e had an exceptionally strong first half of the year with Sprint." (*Id.* ¶ 60.)

Plaintiff alleges that these statements and the Company's 10–Q filings were false and misleading because Novatel was losing market share to competitors. Other wireless carriers were targeting the consumer market by slashing monthly service fees. (*Id.* ¶ 23.) Novatel did not have a viable USB product to immediately compete in this retail market and lost market share to its competitors not only at Sprint, but also at Verizon and in Europe at T–Mobile, Telefonica/O2, and Orange. (*Id.* ¶ 24.) Plaintiff also alleges that Novatel shifted its focus to the European market in the second half of 2007 because Defendants knew that Novatel was losing market share in the United States. (*Id.* ¶¶ 25–27.) Novatel's international sales trended upward throughout 2007, even though international sales adversely affected Novatel's profit margins. (*Id.* ¶¶ 25–27.)

Plaintiff alleges that Novatel's statements concerning the demand for its products were also false and misleading because Defendants failed to disclose that Novatel was prematurely shipping products into a channel they knew was oversaturated. (*Id.* ¶ 28.) Plaintiff alleges that in early 2007, Novatel began shipping as much product as it could to its customers to meet its quarterly and year-end forecasts. (*Id.* ¶ 28.) A former Novatel employee explained, there was always a crunch time at the end of each quarter and that Novatel would frequently ship large amounts of product up to four weeks early so it allegedly could recognize the revenue up front in the current quarter and meet or exceed Wall Street expectations. (*Id.* ¶ 28.) Novatel sold product on credit with extended payment terms in 2007 to Sprint and Verizon in order to ship product early and increase its financial results. (*Id.* ¶ 30.) This practice caused Verizon and

Sprint to be flush with inventory by 4Q07. (*Id.* ¶ 31.) Novatel admitted on November 10, 2008, in its delayed Form 10–Qs for the first and second quarters of 2008, that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period. (*Id.* ¶¶ 28, 62.) Plaintiff alleges that Novatel's stated financial results misled analysts about end-market demand and sales execution because of this practice of early shipment to post strong results throughout 2007. (*Id.* ¶ 29.)

### 3. Prematurely Recognized Revenue in Violation of Novatel's Revenue Cut–Off Procedures and Generally Accepted Accounting Principles ("GAAP")

Plaintiff alleges that Defendants' scheme to inflate revenues began to unravel in the first quarter of 2008. (CC ¶ 32.) On February 20, 2008, Novatel issued a press release forecasting $110 million in revenues for 1Q08, which was $10 million below analysts' estimates. (*Id.* ¶¶ 67–68.) Novatel attributed this guidance to a consolidation issue at its customers who were supposedly focusing on eliminating inventory from Novatel's competitors, stating that, "[w]e believe that the major North American carriers are looking to significantly consolidate vendors down to two suppliers . . . this may have some modest impact as carriers flush through competitors' products as they consolidate vendors and lower inventory." (*Id.* ¶ 68.) Defendants also disclosed on February 20, 2008 that Novatel was seeing the market shift to the consumer segment, and that this "is a positive move that increases our addressable market." (*Id.* ¶ 70.) Defendants' forecasts for 1Q08 and their explanations for them took analysts by surprise as none of Novatel's competitors had mentioned the consolidation issue at Sprint and Verizon when raising their outlooks for the quar-

ter. (*Id.* ¶¶ 67–70.) Plaintiff alleges that in reality, Novatel's main customers were over-extended because of early shipments and had to clear their inventory. (*Id.* ¶ 32.) Novatel's stock price dropped from approximately $14 to as low as $10.20, or roughly 27%, after Defendants' disclosures. (*Id.* ¶ 33.) On March 3, 2008, Novatel filed its Annual Report on Form 10–K with the SEC largely reaffirming the financial results announced on February 20, which was signed by Defendants Weinert and Leparulo and contained SOX certifications. (*Id.* ¶ 72.)

Through 1Q08, Defendants repeated the Company's guidance and told analysts that "we are very pleased with the long-term trends and how we are positioned to fulfill them." (*Id.* ¶¶ 33, 74.) On April 14, 2008, Novatel disclosed preliminary results for 1Q08 that were $19 million below the Company's original forecast of $110 million, and $29 million below the original analyst estimates of $120 million. (*Id.* ¶ 76.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current environment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶ 76, 77.) On May 1, 2008, Novatel issued a press release which stated that, "revenues for the first quarter of 2008 were $91.3 million." (*Id.* ¶ 78.) On May 13, 2008, Novatel filed a Form 12b–25 with the SEC for an extension of time to file its Form 10–Q, disclosing that Novatel could not file its Form 10–Q for the quarter because the Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract, stating that the review was substantially completed. (*Id.* ¶ 79.) Novatel claimed that the review was not expected to change any previously reported · financial statements or earnings. (*Id.* ¶ 79.)

Plaintiff alleges that Novatel's financial results concerning 1Q08 revenues and earnings, as reported in press releases, SEC filings, and conference calls were false and misleading. (*Id.* ¶ 80.) Plaintiff alleges that Novatel failed to disclose that the Company was recognizing revenue in violation of its own revenue cut-off procedures and GAAP, thus rendering the Company's publicly reported financial results materially false. (*Id.* ¶ 80.) On August 19, 2008, Novatel announced that it had broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08. (*Id.* ¶ 81.) As a result of this disclosure, Novatel's stock price dropped from $8.40 to $6.29 in one day. (*Id.* ¶ 83.) On November 10, 2008, Novatel issued its delayed Form 10–Qs for the first and second quarters of 2008, disclosing that the revenues for the first quarter were misstated by $3.4 million due to improper revenue cut-off procedures and accounting irregularities relating to certain customer contracts. (*Id.* ¶ 84.) The Form 10–Qs also indicated that there were several control deficiencies in Novatel's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period. (*Id.* ¶ 84.) After the November 10 disclosure, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008. (*Id.* ¶ 85.)

### Discussion

## I. Motion to Dismiss Pursuant to 12(b)(6)

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block,* 250 F.3d 729, 731 (9th Cir.2001). A complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) to evade dismissal under a Rule 12(b)(6) motion. *Porter v. Jones,* 319 F.3d 483, 494

(9th Cir.2003). Rule 8(a)(2) requires that a pleading stating a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The function of this pleading requirement is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004)). "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.,* 83 F.3d 1136, 1140 (9th Cir.1996); *see also Twombly,* 127 S.Ct. at 1964–65.

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). The court may, however, consider the contents of documents specifically referred to and incorporated into the complaint. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). In evaluating a motion to dismiss, a court may consider evidence on which the complaint "necessarily relies" as long as: (1) the complaint refers to the document; (2) the document is central to

the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006). Defendants request that the Court take judicial notice of nineteen documents, many of which are filings with the Securities and Exchange Commission ("SEC"). (Doc. No. 28.) Plaintiff also requests the Court take judicial notice of various documents, including filings with the SEC, press releases, historical stock prices, a conference call transcript and a summary of Defendants' stock sales. (Doc. No. 33.) The Court grants the parties' request to the extent that the materials are properly subject to judicial notice.

**Falsity and Scienter**

Claims for violations of the federal securities laws are subject to additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1] The PSLRA dictates that a securities complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The Ninth Circuit traditionally analyzes the overlapping requirements of falsity and scienter at the same time. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001) (pleading requirements of PSLRA may be collapsed into single inquiry because analysis of both factors involves same facts); *see No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 932 (9th Cir.2003). A securities fraud claim must "state with particularity facts giving rise to a strong inference" that each defendant acted with the intent to defraud

or with deliberate recklessness. 15 U.S.C. § 78u–4(b)(2); *America West,* 320 F.3d at 931; *In re Silicon Graphics Inc. Securities Litig.,* 183 F.3d 970, 979 (9th Cir.1999) ("deliberate or conscious recklessness").

 As the Ninth Circuit has recognized, "an inevitable tension arises between the customary latitude granted [to] the plaintiff on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and the heightened pleading standard set forth under the PSLRA." *Gompper,* 298 F.3d at 895. The Court accepts as true the allegations of Plaintiff's Complaint; however, with respect to the element of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Id.* at 897. The PSLRA requires a court to "review[ ] the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." *Id.* at 895.

**A. Violation of § 10(b) of the 1934 Act and Rule 10b–5 Against Defendants Leparulo and Weinert**

Plaintiff's first cause of action alleges Defendants Leparulo and Weinert violated § 10(b) of the 1934 Act and Rule 10b–5 by "disseminat[ing] or approv[ing] the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (CC ¶¶ 141–45.)

---

1. Rule 9(b) of the Federal Rules of Civil Procedure, which imposes a heightened pleading standard on claims sounding in fraud, also applies to some of Plaintiff's claims. *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir. 1999) (noting applicability of Rule 9(b) to securities fraud I claims); *see Desaigoudar v.*

*Meyercord,* 223 F.3d 1020, 1023 (9th Cir. 2000) ("The PSLRA modifies Rule 9(b)"). The Court concludes that to the extent Plaintiff has satisfied the strictures of the PSLRA, the Complaint also is sufficient under Rule 9(b).

■ To state a claim under § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), a plaintiff must allege: " '(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.' " *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.2008). Defendants argue that Plaintiff's complaint fails to adequately plead material misrepresentations, a strong inference of scienter, and loss causation, and therefore fails to state a claim under § 10(b) and Rule 10b–5. (Doc. No. 27.)

## 1. False and Misleading Statements

The PSLRA requires a plaintiff to plead allegedly false or misleading statements by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Desaigoudar*, 223 F.3d at 1023. Plaintiff alleges that Defendants Weinert and Leparulo made false or misleading statements concerning financial results, demand for Novatel products, and the sufficiency of Novatel's internal controls contained in SOX certifications.

■ Plaintiff alleges that Novatel's financial results as stated by Weinert and Leparulo were materially misleading throughout the Class Period and did not fairly present the financial condition of Novatel. Plaintiff alleges that Novatel's financial results were rendered false and misleading by Novatel's admission that the Company's financial results in 1Q08 were false and overstated and by Novatel's misrepresentation as to the effectiveness of Novatel's internal controls throughout the entire Class Period on its SOX certifications, which were signed by Defendants Weinert and Leparulo. Plaintiff further alleges that Novatel's admission that it recognized revenue in violation of the Company's own revenue cut-off procedure and GAAP corroborates the allegation that Novatel was shipping product early to meet Wall Street expectations as a regular quarterly practice throughout the Class Period, thereby rendering the financial results misleading. Plaintiff also alleges that the financial results were false or misleading because Novatel concealed that the Company's product mix failed to adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon, which caused Novatel to lose market share.

The Court concludes that with respect to financial results, Plaintiff has adequately alleged false and misleading statements and the reasons those statements were false and misleading. Plaintiff specifically alleges that Weinert and Leparulo were responsible for these statements, as they were quoted in press releases, conference calls, and signed SEC filings attesting to the accuracy of the financial results and effectiveness of the Company's internal controls. Plaintiff alleges that Defendants overstated financial results and gives the reasons why the financial results were misleading. Plaintiff points to Defendants admitting that they falsely reported $3.4 million in revenue for 1Q08 as evidence of the misleading nature of financial results throughout the Class Period due to Defendants' use of improper accounting practices. (*See* CC ¶¶ 81, 91, 92.)

■ Plaintiff also alleges that Defendants' statements concerning the demand for Novatel's products were false and misleading. Weinert and Leparulo made various statements in press releases and conference calls during the Class Period that there was strong demand for Novatel's products, including for its USB products. Plaintiff alleges that these statements were false and misleading because during the Class Period Novatel was losing USB

domestic market share to its competitors, as it did not have a modem to compete in the low-end market, Sprint cancelled its use of the 720 USB modem, Novatel could not compete for a contract with Sprint to provide WiMax data cards and USB modems, and Novatel shifted focus to the European market.

The Court concludes that Plaintiff has adequately alleged false or misleading statements concerning the demand for Novatel's products and market share as Plaintiff alleges specific statements made by Defendants Weinert and Leparulo and the reasons these statements are allegedly false or misleading. Defendant Weinert's and Leparulo's statements are not too generalized or vague, as Defendants made statements such as that Novatel was experiencing "strong demand across our multipronged 3G product portfolio," was "continu[ing] to ramp to meet increasing demand in the marketplace," saw strong demand "across a wide range of products including Ovation USB devices, Merlin PC and Express cards, and Expedite embedded modems," had "innovative products and strong partnerships," expected "strong results, driven by both continuing demand for existing products and the introduction of new products," expected "to be well positioned as WiMAX moves into volume demand," and had "transitioned to Next Generation USB products seeing a stronger uptick in both the U.S. and Europe" and "[d]ue to this demand, we enter the fourth quarter with strong backlog and record order flow ... our major hurdle is tightness in our supply channel for selected components due to the strong demand." (CC ¶¶ 51, 54, 59, 60, 64.) Plaintiff alleges that some of these statements were made by Defendants at the same time they failed to disclose that one of the Company's largest customers, Sprint, would discontinue all further orders of the Company's popular 720 USB card. (*Id.* ¶ 57.) Defendants also disclosed in early 2008 that, "in some

cases, we did not have the right products for the right customers." This statement undercuts Defendants' previously made statements about Novatel's ability to compete in the 3G market and the strong demand for its products. Plaintiff's complaint pleads these allegedly false and misleading statements and the reasons why they are false and misleading with enough particularity to get to discovery.

Plaintiff also alleges that Defendants Weinert and Leparulo made false or misleading statements by falsely certifying in SOX certifications the Company's financial results and effectiveness of the Company's internal controls, as it was later disclosed that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. Defendants argue that the language in Novatel's SOX certifications cannot be transformed into actionable misrepresentations merely because the Company's financial controls turned out to be inaccurate. (Doc. No. 27 at 11.) "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir.2000). Plaintiff does not cite, nor has the Court located, any case holding that a statement in a SOX certification that financial statements comply with GAAP is independently actionable under § 10(b) or Rule 10b5. However, because Plaintiff sufficiently alleges other false and misleading statements made by Defendants and these alleged false certifications may be relevant to a determination of scienter in regards to the other alleged misrepresentations, we need not determine whether standing alone, false SOX certifications are actionable under § 10(b) and Rule 10b–5.

## 2. Safe Harbor Provision

■ Defendants argue that Plaintiff alleges false or misleading statements that were forward-looking and accompanied by meaningful cautionary statements, and therefore are non-actionable. (Doc. No. 27 at 19–20.) In order for a forward-looking statement to be actionable, a plaintiff must allege "facts that would create a strong inference that the defendants made the forecasts with 'actual knowledge . . . that the statement[s were] false or misleading' at the time made." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (*quoting* 15 U.S.C. § 78u–5(c)(1)(B)(I)).

Plaintiff alleges statements other than forward-looking statements that were false and misleading, such as financial results and statements concerning present product demand. (*See, e.g.*, ¶¶ 51, 53, 54, 55, 58, 59.) As discussed below, Plaintiff sufficiently alleges that Defendants acted with scienter when making these statements.

## 3. Materiality

■ Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (*quoting TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'" *S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir.2007) (*quoting In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989)). The Court determines that the Plaintiff has sufficiently alleged false and misleading statements that were material. The alleged manipulation of revenue results by improper accounting and early shipment of product caused Novatel to overstate the Company's financials, product demand, and market share. The significance of this information is illustrated by the emphasis Defendants placed on year over year growth, continuing strong product demand, and strong partnerships in press releases and other public statements. Similarly, the non-disclosure of the cancellation of a contract with Novatel's largest customer was material as it concerned future revenue to Novatel and a change in relationship with its largest customer. The significance of Novatel's relationship with Sprint is underscored by Defendants' references to Novatel's strong relationship with Sprint and analysts reporting that Novatel's stock price was off due to the rumor that Sprint end-of-lifed the 720 USB modem. (CC ¶¶ 17, 60.)

## 4. Scienter

■ To state a claim under Section 10(b), a plaintiff must allege facts giving rise to a strong inference that the defendants acted knowingly or with deliberate recklessness. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.2004). The Supreme Court has held that a Section 10(b) plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible apposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2513, 168 L.Ed.2d 179 (2007). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510 (internal quotations omitted). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 2511 (citation omitted).

■ "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege

that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir.2009) (citations omitted). Facts showing mere recklessness or motive to commit fraud and opportunity are not sufficient to establish a strong inference of deliberate indifference. *Id.* "[T]he plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (citations omitted).

Plaintiff's complaint alleges that Novatel's top management was fully aware of the allegedly undisclosed information during the Class Period because of the size of the company and statements made by Leparulo that he oversaw the day-to-day operations and that the buck stopped with him. (CC ¶¶ 3–4, 10, 16, 116.) Plaintiff alleges that Defendants were undoubtedly aware of Sprint's cancellation of orders for the 720 USB modem due to the size and importance of Sprint's business, as Sprint accounted for 38% of Novatel's revenue in 2006. Plaintiff also alleges that Defendants were undoubtedly aware of the loss of its market share throughout 2007, given the competitive market and the Company's shift to the European market. Plaintiff argues that there is a reasonable inference that Novatel would not have targeted a less profitable market if they were competitive in the most profitable one. "As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *South Ferry LP, No. 2 v. Kil-*linger, 542 F.3d 776, 785–86 (9th Cir.2008) (citation omitted).

To support Plaintiff's core management theory, the complaint alleges insider sales that were suspicious in timing and amount and unusual compared to prior trading history. (CC ¶¶ 116–20.) "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435 (internal quotations omitted). The three relevant factors are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* Plaintiff alleges that Defendants' stock sales were predominately made between May 2007 and November 2007, at prices near the Class Period high of $29 per share. (CC ¶ 117.) Plaintiff alleges that 62% of the Defendants' Class Period sales occurred in June and July 2007, just before the market learned that Sprint would no longer be purchasing Novatel's 720 USB modem, information the company allegedly knew "for some time." (*Id.* ¶ 16.) Defendant Weinert's and Leparulo's stock sales increased abruptly just days before the market learned in late July 2007 that Sprint would no longer be purchasing Novatel's flagship product. (*Id.* ¶ 116.) Plaintiff alleges that Defendants Hadley, Leparulo, Ratcliffe, Souissi, and Weinert all adopted or amended their 10b5-1 trading plans to allow them to sell more shares of stock months before the market learned of Sprint's decision to cancel orders of the 720 USB modem. (*Id.* ¶ 117.) During nine months of the Class Period, Plaintiff alleges that Defendants Hadley, Leparulo, Ratcliffe, Souissi, and Weinert all sold over 90% of their Novatel holdings (excluding vested options) for a combined total of almost $29

million and 1,258,466 shares. (*Id.* ¶ 118.) Plaintiff alleges this was unusual compared to prior trading history, as during the five years prior to the Class Period, Defendants Hadley, Leparulo, Ratcliffe, Souissi, and Weinert sold 938,316 shares of Novatel stock, for a total of almost $18.3 million in proceeds. (*Id.* ¶ 120.)

Defendants argue that their stock sales do not support a strong inference of scienter because they traded according to 10b5–1 plans and Plaintiff does not allege facts to establish that Defendants' trades were timed to maximize personal benefit from the inside information about the Sprint cancellation. (Doc. No. 27 at 13–16.) Plaintiff alleges that the market learned of the Sprint cancellation on July 20, 2007 and that 62% of Defendants' Class Period sales occurred in June and July 2007. (CC ¶ 16.) As the date of the end of the Sprint contract closed in, it was more likely the market would learn of the cancellation. Plaintiff also alleges that these sales took place when Novatel had been recently certified with Vodafone. Thus, Defendants unloading stock near in time to when the market would inevitably learn of the Sprint cancellation does support an inference that Defendants timed their sales to benefit from stock prices before the information leaked to the market. Although Defendants traded according to 10b5–1 plans, Plaintiff's allegations that the Defendants amended their 10b5–1 plans to allow more stock sales based on their inside information supports an inference of scienter. The pattern of Defendants' stock sales also does not square with a typical 10b5–1 plan triggering stock sales on certain dates and at certain prices, as Defendants unloaded varying amounts of stock just before July 20, 2007 on varying dates (i.e. not on the first of every month) and failed to sell in the months after July 2007 when Novatel's stock hit similar prices. This supports the inference that Defendants were not simply selling off stock according to 10b5–1 dates and triggering stock prices.

 Plaintiff also alleges that Defendants systematically reported revenue before it was earned in violation of GAAP. "Violations of GAAP standards can also provide evidence of scienter." *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir.2005). Plaintiff's complaint alleges that Novatel prematurely shipped products into a channel that was over-saturated and recognized revenue early in violation of GAAP. (CC ¶¶ 28–37.) Novatel admitted on November 10, 2008, that the Company lacked adequate internal controls which led to early shipments and GAAP violations. (*Id.* ¶¶ 84, 104–110.) Novatel moved $3.4 million originally recognized in 1Q08 to 2Q08, 4% of its revenues, after conducting an enhanced review of accounting. (*Id.* 91.) A former employee stated that there was always a crunch time at the end of each quarter and that Novatel would frequently ship significant amounts of product up to four weeks early. (*Id.* ¶ 112.) Plaintiff alleges this supports the allegations that Defendants were knowingly violating GAAP in order to exceed or meet Wall Street expectations. (*Id.* ¶ 112.) Plaintiff alleges that Defendants' violations of GAAP were failures to comply with the most basic accounting rules governing revenue recognition. (*Id.* ¶¶ 94–95, 98.) Defendants argue that the accounting error was insignificant in its amount and Novatel never had to issue a restatement; however, the significance of the amount is more appropriately directed to the materiality element of the securities violation claim, which is typically a fact-intensive question. *Phan*, 500 F.3d at 908. Given the complaint's allegations concerning early product shipment, over saturated channels, a restatement of financial results based on GAAP violations, and the simplicity of the accounting principles violated, Defendants'

GAAP violations just as likely support an inference of scienter as an inference of innocent and unknowing behavior.

Plaintiff's complaint alleges that Weinert and Leparulo signed SOX certifications during the Class Period that they knew or had reason to know were false and misleading. " 'Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter.' " *Zucco Partners,* 552 F.3d at 1004 (*quoting Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736, 747–48 (9th Cir.2008)). Weinert and Leparulo signed SOX certifications stating that they had personally ensured the design and effectiveness of the Company's internal controls. (CC ¶¶ 56, 61, 65, 72.) It was later disclosed that the there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period. (*Id.* ¶ 84.) Weinert's and Leparulo's false SOX certifications are relevant to scienter, but are insufficient without more to support a strong inference of scienter.

The Court concludes that Plaintiff adequately alleges Defendants Weinert and Leparulo acted knowingly or with reckless disregard when making materially false or misleading statements. While taken alone false SOX certifications, violations of GAAP, position in corporate management, and suspicious stock sales may not be enough to support a strong inference of scienter, under a holistic approach, these allegations taken together support such an inference at the pleading stage.

### 5. Loss Causation

A § 10(b) claim requires a plaintiff to allege that the plaintiff purchased stock in reliance on the defendants' alleged misrepresentations and that the defendants' misrepresentation or other fraudulent conduct proximately caused the plaintiffs economic loss. *Dura Pharma-* *ceuticals, Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). As stated by the Supreme Court this requirement, which "should not prove burdensome for a plaintiff," may be satisfied by alleging (1) that the plaintiff paid an artificially inflated price for the company's stock and (2) that the stock price fell "after the truth became known" regarding the defendant's misrepresentations. *Id.* "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Sciences Sec. Litig.,* 536 F.3d 1049, 1057 (9th Cir.2008). "A limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible." *Id.* at 1058.

Plaintiff has alleged that it paid an artificially inflated price for the Company's stock due to false and misleading statements concerning Novatel's relationship with Sprint, financial results, product demand, and internal controls. Plaintiff alleges that Novatel's stock price fell after each time the truth became known over the Class Period.

#### a. July 20, 2007

Plaintiff alleges that the truth concerning Sprint's cancellation of its use of Novatel's 720 USB modem became known on July 20, 2007, and that the stock price fell after this disclosure. (CC ¶ 16.) The complaint quotes an analyst report from July 20, 2007, that confirms the market learned of Sprint's cancellation and speculated that Novatel's stock price was sharply off due to the revelation. (*Id.* ¶ 17.) The complaint also alleges that the stock price fell 31% as a result of this disclosure, from $29 per share in late July to almost $20 by the beginning of August. (*Id.* ¶ 17.) Historical stock prices show

that on July 20, 2007, Novatel stock opened at $28.31, which was the high for the day, reached a low of $25.09, and closed at $27.05, on high volume of 3.9 million shares. (Doc. No. 334, Ex. 3 at 136.) Thus, Plaintiff has sufficiently alleged loss causation with respect to Defendants' omission of information concerning Sprint's decision to cancel its use of the 720 USB modem, misleading financial statements, and statements concerning product demand before this revelation. Because the Court concludes that Plaintiff has alleged loss causation as to July 20, 2007, the Court at this time need not address whether Plaintiff can also recover losses suffered between July 21 and August 1, 2007, as that is a factual matter not appropriate for a motion to dismiss.

**b. February 20, 2008 and April 14, 2008**

■■■ Plaintiff alleges that disclosures by Novatel on February 20 and April 14, 2008 caused stock prices to fall on the basis of those disclosures. (CC ¶¶ 7, 8.) On February 20, 2008, Novatel issued a press release forecasting $110 million in revenues for 1Q08, which was $10 million below analysts' estimates. (*Id.* ¶¶ 67–68.) On the same day, Novatel disclosed that carriers were emphasizing the consumer market where Novatel "historically had not placed an emphasis," which undermined Novatel's statements concerning product demand and the superiority of its products. (*Id.* ¶ 7.) On February 20, 2008, Novatel's stock closed at $13.86 per share and after trading on February 21, 2008 had fallen to $10.69 per share, on trading volume of over 11 million shares. (Doc. No. 34, Ex. 3 at 128; CC ¶ 7.) On April 14, 2008, Novatel announced that 1Q08 revenues were $19 million short of Novatel's estimates. (*Id.* ¶ 8.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and

demand in the current environment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶ 76, 77.) These disclosures undercut Defendants' previous statements concerning product demand, ability to compete, and financial statements. On April 14, 2008, Novatel's stock closed at $10.01 per share and after trading on April 15, 2008 had fallen to $7.76 per share, on trading volume of over 12 million shares. (Doc. No. 34, Ex. 3 at 127–28; CC ¶ 8.) Thus, Plaintiff has adequately alleged loss causation with respect to Defendant Weinert's and Leparulo's statements concerning product demand and financial results, as disclosures in 2008 caused stock prices to fall significantly.

**c. August 19, 2008**

■■■ Plaintiff's complaint alleges that Novatel's disclosure on August 19, 2008, that Novatel broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08 revealed the truth concerning a prior misstatement and caused a resulting stock price drop. (CC ¶ 81.) This disclosure contradicted the previous statement of the Company on May 13, 2008 that the review was substantially completed and that no change was expected to any previously reported financial statements. (*Id.* ¶ 79.) This disclosure also undercut Defendants' representations that the Company had sufficient internal controls in place and was acting in accordance with GAAP. Novatel's stock closed on August 19, 2008 at $8.40 per share and dropped the next day to close at $6.29 per share on trading volume of over 7 million shares. (Doc. No. 34, Ex. 3 at 123.) Plaintiff has thus established loss causation regarding Defendants' prior statements concerning 1Q08 revenue and the sufficiency of internal controls based

on this disclosure and resultant drop in stock price.

### d. November 10, 2008

██ Plaintiff's complaint alleges that Novatel's disclosure on November 10, 2008 of its accounting review results disclosed the truth concerning Novatel's internal control deficiencies and caused a resulting loss. The November 10, 2008 disclosure revealed that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constitutes a material weakness. (CC ¶ 129.) This disclosure undercuts Defendants' previous statements concerning financial results, product demand, and SOX certifications. Plaintiff alleges that as a result of this disclosure Novatel's stock price fell from an opening of $5.33 per share on November 10 to a trading as low as $3.90 on November 17, 2008.[2] (*Id.*; Doc. No. 34, Ex. 3 at 121.) This is sufficient to meet the pleading requirements for loss causation.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's first cause of action against Defendants Weinert and Leparulo as Plaintiff has sufficiently alleged a violation of § 10(b) and Rule 10b–5 at this stage based on the entirety of the complaint.

### B. Violation of 10(b) of the 1934 Act and Rule 10b–5 Against All Defendants

Plaintiff's second cause of action is against all Defendants for insider trading in violation of § 10(b) and Rule 10b–5 on the basis of Defendants' knowledge about Sprint's cancellation of its orders for Novatel's 720 USB modem. (CC ¶¶ 146–53.)

Plaintiff alleges that during the class period, "defendants occupied positions with Novatel that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business properts" and that "Defendants' public representations on these subjects were materially false or misleading." (*Id.* ¶ 147.) Plaintiff alleges that "[n]otwithstanding their duty to refrain from trading in Novatel common stock unless they disclosed the materially adverse facts alleged herein, and in violation of their fiduciary duties to plaintiff and other members of the Class, defendants each sold millions of dollars worth of Novatel common stock during the Class Period." (*Id.* ¶ 148.) According to Plaintiff, Defendants sold their shares of Novatel common stock "at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period." (*Id.* ¶ 149.)

██ "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *U.S. v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). "A purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. § 240.10b5–1(b). "To establish liability under 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant

**2.** Plaintiff's complaint cites the date of November 10, 2007 and an opening price of $15.33. (CC ¶ 129.) From a review of the complaint and historical stock prices, this appears to be a typographical error; as the disclosure occurred on November 10, 2008, which had an opening share price of $5.33. (Doc. No. 34, Ex. 3 at 121.) Furthermore, November 10, 2007 was a Saturday.

acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs,* 127 S.Ct. at 2507 (citation omitted).

### 1. Materiality

 As discussed above, the Sprint cancellation of its orders of the 720 USB modem was material. Novatel's largest customer cancelling all future orders for a product would likely be viewed by the reasonable investor to alter the total mix of information, as seen by the market's alleged reaction to the disclosure of the information.

### 2. Scienter

 Plaintiff has sufficiently alleged that Defendants Weinert and Leparulo acted with scienter based on their corporate positions in a small corporation, suspicious stock sales, false SOX certifications, false and misleading statements concerning the financial results of the company and product demand, and violations of GAAP. Plaintiff's complaint alleges Defendants Hadley, Ratcliffe, and Souissi also acted with scienter when selling stock before the July 20, 2007 disclosure of the Sprint cancellation based upon the size of the company and suspicious stock sales.

 Plaintiff alleges that Defendants were undoubtedly aware of Sprint's cancellation of orders for the 720 USB modem due to the size and importance of Sprint's business, as Sprint accounted for 38% of Novatel's revenue in 2006. "As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *South Ferry,* 542 F.3d at 785–86 (citation omitted). Thus, Plaintiff's allegation that Defendants Hadley, Ratcliffe, and Souissi

must have known due to their positions and size of the company is not enough to establish scienter absent some other allegations to support such an inference.

Plaintiff alleges that Hadley's, Ratcliffe's, and Souissi's stock sales were suspicious leading up to the July 20, 2007 disclosure and support an inference of scienter. "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi,* 253 F.3d at 435 (internal quotations omitted). The three relevant factors are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* Hadley sold 220,365 shares in the months leading up to the disclosure of the Sprint cancellation for proceeds of $4,396,746. (CC ¶ 116.) Hadley in the three years prior to the Class period had sold 214,786 shares for proceeds of $3,579,491. (*Id.* ¶ 119.) Ratcliffe sold 115,366 shares in the two months before the disclosure for proceeds of $2,998,178. (*Id.* ¶ 116.) Plaintiff's complaint alleges that Ratcliffe sold no shares in the five years prior to the Class Period. (*Id.* ¶ 119.) Souissi sold 209,938 shares for proceeds of $4,344,488 during the Class Period leading up to the July disclosure. (*Id.* ¶ 116.) In the three years prior to the Class Period Souissi sold a total of 156,716 shares for proceeds of $2,849,050. (*Id.* ¶ 119.) Plaintiff additionally alleges that Defendants Hadley, Ratcliffe, and Souissi all adopted or amended their 10b5–1 trading plans to allow them to sell more shares of stock months before the market learned of Sprint's decision to cancel orders of the 720 USB modem. (*Id.* ¶ 117.)

The Court concludes that Plaintiff sufficiently pleads that Defendants Hadley,

Ratcliffe, and Souissi acted with scienter of the material nonpublic information concerning the Sprint cancellation based upon the importance of Sprint to Novatel's business, the corporate management positions of these Defendants as Senior Vice President of Worldwide Sales and Marketing of Novatel, Senior Vice President of Business Affairs and General Counsel of Novatel, and Senior Vice President and Chief Technology Officer of Novatel, and the suspicious nature of the stock sales of these Defendants leading up to the disclosure to the market of the Sprint cancellation. Although Defendants contend the stock sales were not suspicious because they were made according to 10b5–1 plans, Defendants traded irregularly before July 20, 2007 and did not make similar sales at the same stock prices after July 20, 2007, which undercuts Defendants' stock price trigger argument.

### 3. Loss Causation

As discussed above, the failure of the Defendants to disclose the material information concerning the Sprint cancellation resulted in a loss to shareholders, as Plaintiff sufficiently alleges that it purchased stock at inflated prices due to the non-disclosure and the stock price fell sharply on July 20, 2007 when the information leaked to the market. Accordingly, the Court concludes Plaintiff has sufficiently alleged a cause of action against all Defendants for insider trading on the basis of the Sprint cancellation to meet the PSLRA standards. Disputes between the parties concerning these insider sales are more appropriate for summary judgment.

### C. Violation of § 20(a) of the 1934 Act Against All Defendants

Plaintiff's third and final cause of action is against all Defendants for a violation of § 20(a) of the 1934 Act. (CC ¶¶ 154–55.) Plaintiff alleges "defendants acted as controlling persons of Novatel within the meaning of § 20 of the 1934 Act. By virtue of their positions and their power to control public statements about Novatel, the defendants had the power and ability to control the actions of Novatel and its employees. Novatel controlled the defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act." (*Id.* ¶ 15.)

"Section 20(a) [of the Exchange Act] provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement." *America West,* 320 F.3d at 945; 15 U.S.C. § 78t(a). In order to plead control person liability, a plaintiff must allege (1) a primary violation of the securities laws and (2) "that the defendant exercised actual power or control over the primary violator." *America West,* 320 F.3d at 945 (internal quotations omitted). Scienter is not an element of control person liability; instead, a defendant may assert the affirmative defense of good faith by establishing the absence of scienter. *Howard,* 228 F.3d at 1065. Here the first element is satisfied because, as discussed above, Plaintiff's complaint has adequately alleged a primary violation by Defendants under § 10(b) and Rule 10b–5.

The Court concludes that Plaintiff's complaint alleges that Defendants Weinert, Leparulo, Hadley, Ratcliffe, and Souissi exercised sufficient control over Novatel to state a claim against those individuals for secondary liability for the alleged primary violations by Novatel. The Complaint asserts that these individual Defendants, all of whom were executives of Novatel, "[b]y virtue of their positions and their power to control public statements about Novatel, the defendants had the power and ability to control the actions of Novatel and its employees." (CC ¶¶ 44–

48, 155.) The Complaint alleges that "defendants occupied positions with Novatel that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects." (*Id.* ¶ 147.) Plaintiff also alleges that, "Novatel controlled the defendants and its other officers and employees." (*Id.* ¶ 155.) Thus, the Plaintiff has alleged Defendant Novatel controlled the individual Defendants to state a claim against Novatel for secondary liability for the alleged primary violations by the individual Defendants.

### Conclusion

For the reasons set forth above, the Court DENIES Defendants' motion to dismiss as Plaintiff has met the pleading standards of the PSLRA. The Court orders the Defendants to file an answer within 30 days of the date of this order.

**IT IS SO ORDERED.**